UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

TRAVELERS CASUALTY AND
SURETY COMPANY OF AMERICA,
a Connecticut corporation,

                            NO. CIV. S-07-2493 LKK/DAD

       Plaintiff,

    v.
                            O R D E R

SIDNEY B. DUNMORE, an
individual; SID DUNMORE
TRUST DATED FEBRUARY 28,
2003, a California trust;
SIDNEY B. DUNMORE, Trustee
for Sid Dunmore Trust Dated
February 28, 2003; DHI
DEVELOPMENT, a California
corporation,

       Defendants.

_____/

Defendant Sidney B. Dunmore is engaged in home construction.
Remaining defendants are trusts and business entities related to
Mr. Dunmore.  In the course of defendants' construction business,
various defendants issued a range of bonds.  These defendants
entered an agreement with plaintiff Travelers Casualty and Surety
Company of America wherein Travelers agreed to guaranty these

1

1   obligations, subject to defendants' promise to indemnify plaintiff

2   with respect to these guaranties.  Plaintiff subsequently filed

3   suit bringing claims arising out of this indemnity agreement.

4        Pending before the court is plaintiff's motion for summary

5   judgment on two issues.  Plaintiff seeks indemnity for certain

6   bonds already paid by plaintiff.  Plaintiff also seeks specific

7   performance of a contractual obligation to put forth collateral

8   sufficient to satisfy various pending bonds.  For the reasons

9   stated below, plaintiff's motion is denied.

10                          **I.  BACKGROUND**[1]

11       Plaintiff's complaint names four related defendants.  The

12  first is Sidney B. Dunmore, named as an individual.  The second is

13  also Sidney B. Dunmore, named in his capacity as the trustee for

14  the "Sid Dunmore Trust dated February 28, 2003."  The third

15  defendant is this trust itself.  Fourth and finally is DHI

16  Development, a California corporation formerly known as Dunmore

17  Homes.  Although the parties dispute the precise relationships

18  between these defendants, it is undisputed that all four defendants

19  were signatories to the indemnity agreement at issue in this suit.

20  This agreement was adopted on December 15, 2005.

21       DHI Development (hereinafter "DHI") is a developer engaged in

22  construction and subdivision improvements.  DHI conducts such work

23  _____

24       [1] Plaintiff objects to various pieces of evidence provided by
    defendants, primarily on the grounds of lack of personal knowledge
    and relevance.  Having considered these objections, they are
25  denied.  Defendants also object to some evidence provided by
    plaintiff. Because the court does not rely on this evidence in its
26  resolution of this motion, those objections are denied as moot.

either on its own or through subsidiaries and affiliated entities. For example, the evidence submitted in connection with this motion refers to projects undertaken by "Dunmore Croftwood," "Dunmore Montecito," and "Dunmore Diamond Ridge," each of which is a separate entity. In connection with this work, and subsequent to the indemnity agreement, DHI and related entities entered into contracts or subdivision agreements with clients.

These construction contracts and subdivision agreements incorporated payment bonds and performance bonds. Both types of bonds are contracts signed by DHI or the related entity, as guarantor[2] (here, the plaintiff), and either the subcontractor or client, as appropriate. A payment bond guarantees that a subcontractor will be paid in the event of the general contractor's default. A payment bond "serves two purposes: it assures the owner a lien-free project, and it induces suppliers and subcontractors to accept work on the project, perhaps at a lower price, because of the assurance that they will be paid." Black's Law Dictionary, Eighth Edition, 189 (quoting Grant S. Nelson, Real Estate Finance Law § 12.2, at 881 (3d ed. 1994)). A "performance bond" directly protects DHI's clients. Under a performance bond, the guarantor guarantees that the work will be completed in the event of the developer's default. The guarantor thereby promises to pay an alternate developer to take over the project in this event. Id. at

_____

[2] Pursuant to California Civil Code section 2787, California law does not distinguish between sureties and guarantors. The court therefore uses these and derivative terms interchangeably.

3

1174.  Both bonds are often incorporated into the same instrument, providing for payment or performance, as necessary, relative to the same project.

Also relevant to this dispute are "set aside letters" and "bonded stop notices."  In a set aside letter, the construction project's lender agrees to set aside loan funds equal to the bond amount specifically for the payment or completion of the bonded improvements.  Here, plaintiff acquired set aside letters from various lenders totaling $7,968,043.80.  A stop notice is a statutory alternative to a mechanic's lien.  When a stop notice is available and a (sub)contractor is owed payment for work on a project, the contractor may issue a stop notice to the construction lender.  The lender must then halt further disbursement of funds for a project.  The contractor may then seek satisfaction of obligations owed to him out of the funds that the lender would have provided for the remainder of the project.  See Cal. Civ. Code § 3103; Black's Law Dictionary, Eighth Edition, 1466.  A bonded stop notice is a stop notice for which the issuing contractor provides a bond, guaranteed by an outside surety, for the amount of the claim.  Cal. Civ. Code § 3038.

In partial consideration for the plaintiff's willingness to guaranty payment and performance bonds, plaintiff and defendants entered a general indemnity agreement on December 15, 2005.  Plaintiff's first cause of action alleges that the defendants are in breach of the agreement's indemnification provision.  All four defendants agreed to indemnify plaintiff against all "loss"

1   associated with a guaranty issued on behalf of DHI (or any other

2   indemnitor).   "Loss," as defined by the agreement, includes

3   expenses accrued in connection with investigation of bonds,

4   prosecuting or defending actions arising out of bonds, obtaining

5   the release of bonds, and recovering or attempting to recover

6   property in connection with the indemnity, and enforcement of the

7   indemnity.  "Loss" also includes interest on other forms of loss.

8   The indemnity contract provides a "claim settlement procedure"

9   under which

> [the Surety has] the right, in its sole
> discretion, to determine . . . whether any
> claim . . . brought against the [surety] or
> any Indemnitor in connection with or relating
> to any Bond shall be paid . . . . [The surety]
> shall be entitled to immediate reimbursement
> for any and all Loss incurred under the belief
> it was necessary or expedient to make such
> payments.

15   The indemnity agreement provides that in determining whether a loss

16   has occurred, "an itemized, sworn statement by an employee of [the

17   surety], or any other evidence of payment, shall be prima facie

18   evidence of the propriety, amount and existence of Indemnitors'

19   liability."

20       Plaintiff's second cause of action seeks to enforce the

21   indemnity agreement's "collateral security" provision.   This

22   provides that:

> Indemnitors agree to deposit with Company
> [i.e., plaintiff surety], upon demand, an
> amount as determined by Company sufficient to
> discharge any Loss or anticipated Loss.
> Indemnitors further agree to deposit with
> Company, upon demand, an amount equal to the
> value of any assets or Contract Funds

> improperly diverted by any Indemnitor. Sums deposited with Company pursuant to this paragraph may be used by Company to pay such claim or be held by Company as collateral security against any Loss or unpaid premium on any Bond. Company shall have no duty to invest, or provide adequate interest on, the deposit. Indemnitors agree that Company would suffer irreparable damage and would not have an adequate remedy at law if Indemnitors fail to comply with the provisions of this paragraph.

After the indemnity agreement was adopted, DHI entered into a number of contracts and subdivision agreements. In connection with these contracts and agreements, plaintiff guaranteed sixty-five bonds. DHI subsequently went bankrupt, and has defaulted on numerous such bonds. As a result, certain obligees (i.e., persons or entities whom DHI and plaintiff owed a duty under the bonds) have made claims against these bonds. Pl.'s UF 19. Plaintiff has paid out $6,407,817.52 to claimants under the payment bonds. As yet, no claims have been paid on performance bonds. Together with investigation costs, defense costs, and interest, plaintiff argues that the loss associated with these claims is $8,228,286.70. Defendants have not paid plaintiff any money in connection with the indemnity agreement. Plaintiff also seeks $25,172,526.10 in collateral security to guard against pending claims and associated expenses, which involve both payment and performance bonds.

Plaintiff filed this suit on November 19, 2007. Soon thereafter, plaintiff secured attachment of two pieces of residential property owned by defendant Sidney Dunmore, located in Granite Bay, CA and Palm Desert, CA. Orders of December 13, 2007

1  and January 7, 2008.  Although these properties were valued at $7.8
2  million at the time of attachment, both are encumbered by senior
3  deeds of trust, and as a result of these deeds and of a decline in
4  property values, the two together provide only $110,000 in
5  security.  Pl.'s UF 28-35.

6  Plaintiff's pending motion seeks summary judgment as to
7  failure to indemnify plaintiff for money it has already paid to
8  bond claimants and specific performance of the contract's
9  collateral security provision (i.e., additional money in the amount
10  of potential future claims).  In light of the fact that DHI is
11  currently involved in bankruptcy proceedings, plaintiff brought
12  this motion only with respect to the other three defendants.

13  Several other proceedings are relevant to this dispute.  In
14  the DHI bankruptcy proceeding, plaintiff seeks to recover certain
15  assets of Sidney Dunmore.  Plaintiff has also brought suit against
16  various banks seeking money owed to plaintiff under the set-aside
17  letters.  Finally, several of the contractors who have been paid
18  under the payment bonds had also filed stop-work notices with the
19  various project lenders.

20  **II. STANDARD FOR A MOTION FOR SUMMARY JUDGMENT**

21  Summary judgment is appropriate when it is demonstrated that
22  there exists no genuine issue as to any material fact, and that the
23  moving party is entitled to judgment as a matter of law.  Fed. R.
24  Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157
25  (1970); <u>Poller v. Columbia Broadcast System</u>, 368 U.S. 464, 467
26  (1962); <u>Jung v. FMC Corp.</u>, 755 F.2d 708, 710 (9th Cir. 1985); <u>Loehr</u>

7

v. Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th Cir. 1984).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.

1   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

2   586 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391

3   U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d

4   1276, 1280 (9th Cir. 1979), cert. denied, 455 U.S. 951 (1980).

5        In attempting to establish the existence of this factual

6   dispute, the opposing party may not rely upon the denials of its

7   pleadings, but is required to tender evidence of specific facts in

8   the form of affidavits, and/or admissible discovery material, in

9   support of its contention that the dispute exists.   Rule 56(e);

10  Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at

11  289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).   The

12  opposing party must demonstrate that the fact in contention is

13  material, i.e., a fact that might affect the outcome of the suit

14  under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S.

15  242,  248  (1986);  T.W.  Elec.  Serv.,  Inc.  v.  Pacific  Elec.

16  Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

17  dispute is genuine, i.e., the evidence is such that a reasonable

18  jury could return a verdict for the nonmoving party, Anderson, 242

19  U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

20  (9th Cir. 1987).

21       In the endeavor to establish the existence of a factual

22  dispute, the opposing party need not establish a material issue of

23  fact conclusively in its favor.   It is sufficient that "the claimed

24  factual dispute be shown to require a jury or judge to resolve the

25  parties' differing versions of the truth at trial."   First Nat'l

26  Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631.   Thus,

the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982).  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)); Abramson v. University of Hawaii, 594 F.2d 202, 208 (9th Cir. 1979).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

1  <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

2  ### III. ANALYSIS

3  Plaintiff seeks summary judgment on two claims.  Both are for
4  breach of contract, namely, the indemnity agreement.  The claims
5  differ in the remedies sought.  The first seeks damages for failure
6  to indemnify plaintiff for claims already paid, whereas the second
7  seeks specific performance of the secured collateral provision.

8  A cause of action for breach of contract includes four
9  elements: that a contract exists between the parties, that the
10 plaintiff performed his contractual duties or was excused from
11 nonperformance, that the defendant breached those contractual
12 duties, and that plaintiff's damages were a result of the breach.
13 <u>Reichert v. General Ins. Co.</u>, 68 Cal. 2d 822, 830 (1968); <u>First</u>
14 <u>Commercial Mortgage Co. v. Reece</u>, 89 Cal. App. 4th 731, 745,
15 (2001). Here, the parties agree that these elements are satisfied,
16 i.e., that the indemnity agreement is a valid contract, that
17 plaintiff has complied with the express terms of the contract, that
18 defendants have not indemnified plaintiff for claims already paid
19 or put forward secured collateral, and that plaintiff has suffered
20 damages as a result.  However, defendants dispute the amount of
21 damages suffered by plaintiff.  In addition, defendants raise the
22 affirmative defenses of a breach of the implied covenant of good
23 faith and fair dealing and a failure to mitigate damages.
24 Underlying these legal theories are three basic arguments.
25 Defendants argue that the possibility of recovery from alternative
26 sources should reduce the defendants' obligations under either

11

1 claim.  As to claims that have already been paid, defendants argue

2 that plaintiff paid out some claims improperly.  Finally, as to

3 plaintiff's calculation of potential future claims, defendants

4 argue that plaintiff double-counts certain of plaintiff's

5 obligations.

6     Defendants further oppose this motion on the ground that

7 discovery is not scheduled to close for sixteen months.[3]  This

8 final argument greatly influences the court's resolution of this

9 motion.  A party cannot defeat a motion for summary judgment simply

10 on the ground that discovery has not yet closed.  Instead, a party

11 must provide some indication as to what discovery is to be had and

12 the issues on which discovery is necessary.  <u>Tatum v. City & County</u>

13 <u>of San Francisco</u>, 441 F.3d 1090, 1101 (9th Cir. 2006); Fed. R. Civ.

14 P. 56(f); Local Rule 56-260.  Defendants have met that burden here.

15 As discussed below, defendants raise some sound legal theories

16 regarding the extent of defendants' obligations.  These theories

17 demonstrate that additional discovery may produce evidence raising

18 further questions of material fact regarding plaintiff's failure

19 to secure subrogation rights, potentially unreasonable payment of

20 claims, and plaintiff's anticipated liability on some potential

21 claims.

22     If discovery were closed, the court could grant plaintiff's

23

24     [3] At the last scheduling conference, the court and the parties
stated that discovery would close on September 30, 2010, with law
25 and motion to close on November 30, 2010.  The scheduling order
subsequently released by the court reversed these two dates.  That
26 scheduling order is in error, and the court corrects it here.

1  motion in part, reducing the damages and required specific
2  performance in light of the questions raised by the available
3  evidence.  However, because defendants seek, through the remaining
4  discovery, additional evidence that would support broader
5  application of their legal theories, the court cannot yet perform
6  this calculation.  Accordingly, for the reasons further explained
7  below, the court denies plaintiff's motion as provided by Fed. R.
8  Civ. P. 56(f).[4]  This denial is without prejudice.

9  **A.   The Affirmative Defenses**

10     **1.   The Implied Covenant of Good Faith and Fair Dealing as**
11         **Applied to Indemnification of Guarantors**

12     Under California law, every contract carries with it an
13  implied covenant of good faith and fair dealing.  Carma Developers
14  (Cal.), Inc. v. Marathon Development California, Inc., 2 Cal. 4th
15  342, 371 (1992) (noting that this duty is also recognized by most
16  other jurisdictions, the restatement, and the Uniform Commercial
17  Code).  This duty requires contracting parties to exercise
18  discretion given to them under the contract in a way consistent
19  with the parties' expectations at the time of contracting.  Id. at
20  372-73.  A party breaches this duty when it acts in a way that

---

22     [4] At the hearing on this motion, plaintiff argued that
23  defendants should not be permitted to rely on the need to conduct
   future discovery because defendants have not been diligent in
   conducting discovery to this date.  This argument does not appear
24  in plaintiff's briefing in support of this motion.  Defendants
   responded that they have reasonably relied upon a discovery
25  schedule adopted by stipulation of the parties.  At this time, the
   court cannot conclude that defendants have waived the right to
26  conduct future discovery on these issues.

deprives another contracting party of benefits conferred by the contract.  Such a breach does not require subjective bad faith or a breach of the contract's express terms.  <u>Id.</u> at 373.  Because this duty serves to protect the reasonable expectations bargained for under the contract, the contours of this duty can be modified by the parties at the time of contracting.  <u>Id.</u> at 374.  When a contract expressly permits certain acts, a party engaging in those acts does not violate the duty of good faith.  <u>Id.</u> at 374-76.

Defendants argue that this court should further apply the heightened duty of good faith imposed on insurers in insurance policy contracts.  <u>See, e.g.</u>, <u>Jonathan Neil & Assoc. v. Jones</u>, 33 Cal. 4th 917, 932 (2004) (discussing the California law of insurance bad faith).  This heightened duty compels an insurer, in deciding whether to settle an insurance claim, to give "at least as much consideration to the welfare of its insured as it gives to its own interests," <u>Egan v. Mutual of Omaha Ins. Co.</u>, 24 Cal. 3d 309, 818 (1979).  In addition, a claim for insurance bad faith sounds in tort as well as contract, such that tort damages are available.  <u>Jonathan Neil & Assoc. v. Jones</u>, 33 Cal. 4th 917, 932 (2004).  However, contrary to defendants' assumption, California courts have held that the law of insurance bad faith does not apply to sureties.  While an insurer stands as a fiduciary or quasi-fiduciary to the insured, this relationship is not present in surety relations, even when the parties have disparate bargaining power.  <u>Cates Constr. v. Talbot Partners</u>, 21 Cal. 4th 28, 53-55 (1999) (discussing <u>Foley v. Interactive Data Corp.</u>, 47 Cal. 3d 654,

692 (1988)).   The California Supreme Court has held that tort damages are not available in a good faith and fair dealing suit against a surety.   Id. at 61.   Similarly, California Courts of Appeal have held that unlike an insurer's obligation to an insured, a surety is not required to give a heightened degree of consideration to the interests of an indemnitor.   Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co., 47 Cal. App. 4th 464, 483 (1996) (noting that a surety is not required to "compromise its interests to protect interests of the principal.").

Although sureties do not bear a heightened duty of good faith, California courts have held that a surety's payment of claims can violate the general duty of good faith and fair dealing.   Arntz, 47 Cal. App. 4th at 483.   In Arntz, a surety took over a contract pursuant to a performance bond.   The surety then incurred expenses in connection with completion of that contract, pursuant to contractual provisions that allowed the surety to incur such expenses "at its option and in its sole discretion . . . whenever, in its sole opinion, such action is desirable or necessary"  and to "take such action as it might deem necessary or proper to obtain its release from any and all liability under the said bond or bonds."   Id. at 481.   The surety then sought indemnification for these expenses.   The principal obligor, who was also the indemnitor, argued that some of the expenses were incurred in violation of the surety's duty of good faith and fair dealing, such that indemnification of those expenses was not required.   The California Court of Appeal recognized that pursuant to this

1   contractual language, the surety "was given broad discretion . .
2   . requiring its exercise of good faith. 'The covenant of good faith
3   finds particular application in situations where one party is
4   invested with a discretionary power affecting the rights of
5   another.'"  Id. at 482 (quoting Carma Developers, 2 Cal. 4th at
6   372).  Applying this standard, the court concluded that it would
7   have been objectively unreasonable for the surety to have concluded
8   that it was desirable or necessary to pay certain expenses, such
9   that the surety's payment of claims relating to those expenses
10  violated the duty of good faith.  Indemnification as to those
11  expenses was therefore not required.  Id. at 483.[5]  Nonetheless,
12  the court held that the surety's lack of good faith as to certain
13  expenses did not preclude indemnification as to other expenses that
14  were incurred in good faith.  Id. at 484.  Thus, the breach of this
15  duty only reduced the surety's recovery.  The court then separately
16  concluded that the surety could not seek indemnification for claims
17  arising out of the surety's own mismanagement of the project,
18  occurring subsequent to the above-discussed claims.

19      Here defendants argue that plaintiff breached the covenant of
20  good faith and fair dealing in the same manner identified in Arntz,

21

22  [5] Although plaintiff here argues that Arntz applied the law
    of insurance bad faith, the court in Arntz explicitly stated that
23  its holding was not based on insurance bad faith law, which the
    court stated did not apply to sureties, and that the holding was
24  instead based on the general duty of good faith and fair dealing
    implicit in all contracts, insurance or otherwise.    In
25  distinguishing sureties from insurers, Arntz relied upon Schmitt
    v. Insurance Co. of North America, 230 Cal. App. 3d 245, 257
26  (1991), which was later relied upon by the California Supreme Court
    in Cates Constr. Inc., 21 Cal. 4th at 38.

1  i.e., by paying out claims that should not have been paid.
2  Defendants also make an argument not considered in <u>Arntz</u>, that the
3  duty of good faith obliged plaintiff "to protect[] Defendants from
4  incurring damages which may arise from [plaintiff's] failure to
5  obtain subrogation rights to pursue and collect from collateral
6  sources which would reduce the amount paid by or owing to
7  [plaintiff] under the applicable bonds."  The court now considers
8  the merits of both types of arguments in parts B and C, below.

9       **2.  Mitigation of Damages**

10      A party "cannot recover for harm he could have foreseen and
11  avoided by . . . reasonable efforts and without undue expense."
12  <u>Brandon & Tibbs v. George Kevorkian Accountancy Corp.</u>, 226 Cal.
13  App. 3d 442, 460 (1990).  Failure to mitigate damages is an
14  affirmative defense.  Thus, the burden of showing that losses could
15  have been avoided falls on the breaching party.  <u>Id.</u>  Typically,
16  the duty to mitigate arises when the injured party has an
17  opportunity to prevent continuation or enhancement of the injury.
18  <u>Valle De Oro Bank v. Gamboa</u>, 26 Cal. App. 4th 1686, 1691 (1994).
19  "For example, a landowner should avoid the certain loss of trees
20  and crops by reasonably irrigating the land while a dispute over
21  the contract price of water is resolved.  An owner's recovery for
22  deprivation of use of a damaged vehicle is limited to the time
23  reasonably required for making the necessary repairs."  <u>Id.</u> (citing
24  <u>Henrici v. South Feather Land etc. Co.</u>, 177 Cal. 442 (1918),
25  <u>Valencia v. Shell Oil Co.</u>, 23 Cal. 2d 840, 844 (1944)).
26  Conversely, <u>Valle De Oro Bank</u> summarized several cases where

mitigation was not required.  In one, parties contracted to sell a company, and the seller delivered all stock in the company to a buyer.  Id. at 1692 (citing Capaldi v. Levy, 1 Cal. App. 3d 274 (1969)).  When the buyer subsequently breached his obligation by failing to pay, the sellers were not required to mitigate losses by continuing to operate the company.  Id.  Similarly, a lessor is not required to mitigate damages arising from a breach of a lease by re-leasing the property.  Id. (citing Seabord Music Co. v. Germano, 24 Cal. App. 3d 618, 622-623 (1972)).  In these latter cases, the injured party has not increased the measure of damages it is owed; it has merely declined to take some other action which would offset these damages.

This court is not aware of any opinion determining, under California law, whether a surety is obligated to mitigate claims by seeking payment from alternative sources before seeking to be indemnified for them.  Plaintiff identifies cases from several other jurisdictions that have considered the problem, two of which speak to the issues here.  An Ohio Court of Appeal held that a surety that had paid a claim on a construction bond could collect on an indemnity agreement without first collecting other money that could have satisfied part of the claim.  Four Seasons Environmental, Inc. v. West Field Co., 638 N.E.2d 91, 92-93 (Ohio App. 1994).  A bankruptcy court in the Middle District of Florida held that when a surety is protected by multiple indemnity with both the principal and a third party indemnitor, the principal could not require the surety to collect on the other indemnity

agreement before seeking indemnification from the principal.  <u>In</u>
<u>re George Hunt, Inc.</u>, 65 B.R. 627, 630 (Bankr. M.D. Fla. 1986).
It appears to this court that those are reasonable conclusions.

## B.   Alternative Sources of Recovery

Defendants' first argument is that plaintiff's recovery under
both the indemnity claim and the collateral security claim should
be reduced because alternative sources of recovery are available
to plaintiff.  Defendants identify three types of sources. First,
they point to plaintiff's pending claim in a separate bankruptcy
proceeding for assets formerly held by defendant Sidney Dunmore;
then plaintiff's claim in separate litigation for money owed under
the set-aside letters; and lastly, potential recovery under bond
claimants' bonded stop notices seeking amounts in excess of the
set-aside letters.  Although the court concludes that plaintiff was
not required to first seek recovery from these alternative sources,
or to reduce its indemnification amount by the potential recovery
from these sources, the court further concludes that defendants'
related argument concerning forfeiture (rather than exercise) of
subrogation rights has merit.

### 1.   The Bankruptcy Proceeding

In DHI's bankruptcy proceeding, plaintiff "seeks to recover
in cash . . . Mr. Dunmore's 2007 tax refund in the sum of
$12,819,198." <u>See</u> Defs.' Request for Judicial Notice, Ex. A.  The
court notes that plaintiff has not recovered this money yet, and
that any such recovery remains uncertain.  Therefore, as of this
date, plaintiff's damages may be properly calculated without regard

19

to this amount.[6]   Plaintiff's attempt to enforce the indemnity agreement without regard to that litigation is not a breach of the duty of good faith.   It is true that the agreement confers upon plaintiff discretion as to how to seek recovery, and that contractual provisions conferring discretion often implicate the duty of good faith.   Carma Developers, 2 Cal. 4th at 373.   However, by rendering all indemnitors accountable, the indemnity agreement expressly contemplated that the discretion would be used in the manner seen here.   Id. at 374. Provided that the plaintiff guarantor has not already recovered for certain claims, it may seek recovery from whichever indemnitor it chooses without violating the duty of good faith.   Similarly, plaintiff is not required to attempt to mitigate damages by waiting until the completion of the bankruptcy litigation, because plaintiff is not increasing damages or the extent of defendants' liability.   Valle De Oro Bank, 26 Cal. App. 4th at 1691.   Although plaintiff has chosen to pursue that collateral source of recovery in parallel, plaintiff was not obligated to do so to mitigate plaintiff's damages.   Four Seasons Environmental, Inc., 638 N.E.2d at 92-93.

**2.  Set-Aside Litigation**

Plaintiff is also involved in litigation seeking to recover $7,968,043.90 allegedly owed to plaintiff by various banks or

---

[6] Nor does it appear that there is a risk that plaintiff will doubly recover.  If plaintiff succeeds in this action prior to resolution of the bankruptcy litigation, it appears that defendants here will be able to assume plaintiff's position in that proceeding.

1  lenders in connection with set-aside agreements.  Under these

2  agreements, the banks were obliged to set aside money sufficient

3  to cover plaintiff's obligations on the subject bonds.  Thus, if

4  this money is recovered, defendants will not need to indemnify

5  plaintiff for those claims.  However, plaintiff's recovery of this

6  sum, as with plaintiff's recovery of assets in the bankruptcy

7  litigation, remains uncertain.  Similarly, the indemnity agreement

8  indicates that the parties did not expect that plaintiff would be

9  obliged to pursue this avenue of recovery.  Accordingly, the set-

10  aside litigation also does not affect plaintiff's ability to

11  recover from defendants.

12  **3.   Bonded Stop Notices**

13     Finally, four payment bond claimants have filed stop notices

14  relating to money owed to them, seeking $5,955,680.56 in total.

15  Some, but not all, of these stop notices pertain to bonds which are

16  also protected by set-aside agreements.  Unlike the above sources

17  of recovery, which provide alternative avenues of recovery for

18  plaintiff, the stop notices provide alternative recovery for the

19  bond claimants.  Accordingly, the stop notices raise several

20  distinct issues.

21     First, plaintiff could have intervened in the stop notice

22  proceedings, but did not.  In this regard, plaintiff's decision not

23  to intervene is analogous to a decision not to seek payment from

24  any other third party source, and is neither a failure to mitigate

25  nor a breach of the duty of good faith.

26     Second, defendants may imply that plaintiff should not have

1   paid claims brought by obligees who were also attempting to recover

2   via a stop notice.  However, in this regard, plaintiff's position

3   is apparently indistinguishable from that of defendants here, as

4   plaintiff's obligation to the obligees did not permit plaintiff to

5   insist that the obligees first exhaust other possible sources of

6   recovery.

7        Third, and most challenging for the court, is defendants'

8   argument that when plaintiff did make payments to bond claimants

9   who had also filed stop notices, plaintiff failed to acquire

10  subrogation rights to those stop notices.  <u>See</u> Declaration of

11  Michael Lutz, ¶ 5(c).  At least one bond claimant, after receiving

12  payment from plaintiff without a request for subrogation rights,

13  subsequently amended the stop notice to reduce the amount sought

14  from the lender by a corresponding amount.  <u>Id.</u>  Thus, the ability

15  to seek subrogation for the amount paid on that claim from the stop

16  notice may have been irrevocably lost.[7]  While it is clear that,

17  had plaintiff acquired subrogation rights to the stop notices,

18  plaintiff would not itself have been obligated to exercise these

19  rights, defendants' argument is that plaintiff has precluded

20  defendants from subsequently acquiring and exercising such rights.

21  _____

22       [7] Plaintiff has argued that this purported fact is irrelevant,
    but has not otherwise disputed it.

23       Defendants' statements are inconsistent as to whether these
    subrogation rights could still be sought by plaintiff, or have

24  instead been permanently forfeited.  Because defendants have
    provided at least some evidence indicating the latter, and because

25  all evidence is construed in the light most favorable to the non-
    moving party, the court assumes for purposes of this motion that

26  these rights are permanently lost.

1  Defendants argue that this preclusion violated both the duty of

2  good faith and the duty to mitigate damages.

3      If plaintiff caused these rights to be irrevocably lost, this

4  act breached the duty of good faith and fair dealing.  As discussed

5  above, under the indemnity agreement, defendants could not have

6  reasonably expected that plaintiff would exhaust alternative

7  sources of recovery.  However, an indemnitor reasonably expects

8  that once he pays on an obligation, he can pursue other remedies

9  previously available to the obligee.  Here, if plaintiff chose to

10  pay claims in a way that deprived defendants of this benefit,

11  plaintiff acted objectively unreasonably and in violation of the

12  duty of good faith.

13      Thus, defendants have provided evidence, in the form of a

14  declaration regarding forfeiture of subrogation rights, sufficient

15  to raise a question of material fact as to whether plaintiff

16  breached the duty of good faith and fair dealing with regard to

17  payment bond claims for which stop notices had been filed.

18  **C.    Indemnity for Claims Already Paid**

19      Plaintiff seeks to recover for the $6,407,817.52 it has

20  already paid to payment bond claimants.  Defendants argue that some

21  of these claims should not have been paid.  Because the indemnity

22  agreement's claims settlement provision gives the plaintiff the

23  unilateral power to decide whether and how to pay claims,

24  plaintiff's payment of such claims was consistent with the express

25  terms of the contract.  See Commercial Ins. Co. v. Pacific-Peru

26  Constr. Corp., 558 F.2d 948, 953 (9th Cir. 1977).  Nonetheless,

1  <u>Arntz</u> established that a surety's exercise of discretion as to

2  payment of claims may violate the duty of good faith and fair

3  dealing.    Pursuant  to  the  indemnity  agreement's  prima  facie

4  evidence clause, plaintiff has established a prima facie case that

5  these claims were paid in good faith.    This clause shifts the

6  burden of proof at trial.  <u>See</u> <u>Fallon Elec. Co. v. Cincinnati Ins.</u>

7  <u>Co.</u>, 121 F.3d 125, 128 (3d Cir. 1997).    To defeat this motion,

8  notwithstanding this clause, defendants merely need to present

9  evidence creating a question of material fact.

10      Defendants argue that plaintiff paid claims that were "(a)

11  excessive,  (b)  for  work  performed  which  is  not  subject  to

12  applicable bonds; [and] (c) not valid claims or are for unwarranted

13  amounts." Most significantly, plaintiffs provide evidence that for

14  some claims, plaintiff paid claims for work that was not actually

15  performed, or for work that was performed inadequately.  <u>See</u> Lutz.

16  Decl. ¶¶ 22, 24(c).  Defendants further argue that plaintiff was

17  informed of these problems before the claims were paid.  Plaintiff

18  has not responded to this evidence or argument.    In <u>Arntz</u>, the

19  California Court of Appeal held that payments of this type violate

20  the duty of good faith and fair dealing, such that indemnification

21  was not required for such payments.    47 Cal. App. 4th at 482.

22  Although  the  indemnity  agreement's  claims  settlement  provision

23  grants plaintiff the authority to determine whether to pay claims,

24  this authority must be exercised consistent with the duty of good

25

26

1 faith and fair dealing.[8]

2     As a separate issue, defendants argue that in relation to many

3 municipal and subdivision development projects, plaintiff paid

4 claims for work that was not covered by applicable bonds.  These

5 arguments refer to landscaping, grading, and other work performed

6 on property that will ultimately be dedicated to government

7 entities.  Plaintiff contends that these payments fell within the

8 scope of the applicable bonds, because these bonds need not

9 precisely define the bonded work, and instead apply to all work on

10 property that will be conveyed to the public.  In light of this

11 court's resolution of defendants' prior argument, the court need

12 not resolve this question on this motion.

13 **D.   Collateral for Future/Anticipated Claims**

14     Pursuant to the "Collateral Security" provisions of the

15 indemnity agreement, plaintiff requested that defendants provide

16 plaintiff with money sufficient to satisfy anticipated claims.

17 These "anticipated claims" amount to $3,387,674.81 in claims

18 asserted against plaintiff in other pending litigation, Decl. of

19 Sam. E. Barker, 25, and $20,439,851.29 in claims not yet the

20 subject of litigation, id. at 26.  Both estimates exclude

21 attorney's fees, interest, etc., and when these costs are included,

22

23     [8] It is unclear the extent to which the holding in Arntz was based on the contractual requirement in that case that payments be made only when they were "desirable or necessary."  See 47 Cal.

24 App. 4th at 483.  This court need not determine whether the contract's use of such language was controlling, because the

25 indemnity agreement in this case similarly indemnifies the surety only for losses "incurred under the belief that it was necessary

26 or expedient to make such payments." (emphasis added).

plaintiff estimates that its potential loss is for $25,172,526.10. Defendants have refused to provide such collateral, and plaintiff now seeks to compel provision of such collateral as specific performance of the indemnity agreement's collateral security provision. This section of the agreement provides that the parties "agree that [the surety] would suffer irreparable damage and would not have an adequate remedy at law if Indemnitors fail to comply with the provisions of [the collateral security provision]."

As with the other contractual provisions, defendants do not challenge the validity of the collateral security provision or of plaintiff's demand for specific performance. Defendants' only dispute is to plaintiff's estimate of potential losses.

First, defendants argue this estimate should be reduced because of the availability of alternative sources of recovery. This argument is discussed above and found wanting. The only aspect of that argument found to have merit--plaintiffs' failure to acquire subrogation rights to claims for which stop notices had been filed--does not apply to claims which have not yet been paid, for which subrogation could not yet have been forfeited. In addition, the majority of the pending claims are for performance bonds rather than payment bonds. For these claims, defendants have not identified a similar source of potential third-party recovery which could be subrogated.

Defendants separately argue that plaintiff has overstated its potential losses by including the full values of both the payment and performance bonds for particular projects. As explained above,

a payment bond is a promise to pay a subcontractor for work the subcontractor has already performed, whereas a performance bond is a promise to the client to pay to have unfinished work completed. Although both the payment and performance bonds for a project may each have a "face value" equal to the full cost of the project, a guarantor will ordinarily not obliged the pay the full value of both, i.e., twice the cost of the project.  Instead, at the beginning of the project, the obligation under the payment bond is nothing, whereas the obligation under the performance bond is the full value.  As work is completed, the obligation on the payment bond increases and the obligation on the performance bond correspondingly decreases.  Defendants provide various examples of projects where defendants' declarant states that work has been completed such that while there is a potential obligation on a payment bond, there has been a corresponding decrease in the obligation on a performance bond.  Lutz Decl. ¶¶ 17, 18, 19, 21, 22.

The inverse correlation between the obligations on payment and performance bonds may be imperfect.  Here, plaintiff argues that the correlation is particularly weak, because defendants have allowed much partially completed work to go into disrepair. Thus, while this work was completed, and payment for it is owed, plaintiff argues that this work will need to be completed again. So long as there is a possibility that work will need to be re-done, plaintiff's potential exposure on any project is for the maximum amount of the performance bond, plus the existing amount

of the payment bond.   Nonetheless, defendants have provided evidence that would enable a trier of fact to conclude that plaintiff's "anticipated Loss" on some potential claims, in the words of the agreement, is less than the amount claimed by plaintiff.   In some cases, this is because work has been completed and further performance will not be required.   Lutz Decl. ¶¶ 17, 18, 19, 21, 22.

Defendants' third argument regarding pending claims is that plaintiff's estimate of "anticipated loss" includes guaranties on bonds as to which no claim has been filed. Lutz Decl. ¶ 6.   The indemnity agreement does not specify how "anticipated losses" are to be calculated, and it is not clear that the claim settlement and prima facie evidence clauses apply to anticipated losses. Although courts have interpreted surety indemnification agreements' collateral security terms liberally, plaintiff has not provided any authority or argument indicating that anticipated losses should include exposure on bonds for which no claim has been filed. C.f. Safeco Ins. Co. of America v. Schwab, 739 F.2d 431, 433 (9th Cir. 1984) ("A collateral security provision provides that once a surety such as Safeco receives a demand on its bond, the indemnitor must provide the surety with funds which the surety is to hold in reserve.").

Finally, defendants argue that plaintiff cannot reasonably anticipate loss as to some bonds for other reasons.  For example, defendants provide testimony that at least one bond has expired. Id. ¶ 20.

1      For these reasons, the court concludes that there are material

2   questions of fact as to the amount of anticipated loss for which

3   the indemnity agreement requires provision of collateral security.

4   Because defendants' discovery on these issues is incomplete, the

5   court cannot calculate a floor or minimum value for the anticipated

6   for the loss, and therefore cannot award summary judgment even for

7   some lesser value.  Accordingly, plaintiff's motion for summary

8   judgment as to this claim is denied.

9                        **IV. CONCLUSION**

10     For the reasons stated above, the court ORDERS as follows:

11     1.   Plaintiff's motion for summary judgment is DENIED

12          WITHOUT PREJUDICE.

13     2.   The scheduling order issued on April 2, 2009, Doc. No.

14          82, is AMENDED to provide that

15          a.   All discovery shall be conducted so as to be

16               completed no later than September 30, 2010, with

17               expert disclosure due 90 days prior.

18          b.   Motions to compel discovery shall be noticed on so

19               as to be heard not later than August 30, 2010.

20          c.   All Law and Motion matters shall be filed so as to

21               be heard no later than November 30, 2010.

22   IT IS SO ORDERED.

23   DATED:  June 5, 2009.

24

25                                    LAWRENCE K. KARLTON
                                      SENIOR JUDGE
26                                    UNITED STATES DISTRICT COURT

                                      29